JUDGE GARDEPHE

14 CV 2464

SEALED

16-15440
SECT. B MAG. 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA,        :
ex rel. PHILIP BERGERON,        :
                                :
              Plaintiffs,     :
                                :
        v.                   :    No.
                                :
UTC LABORATORIES, LLC, d/b/a  :    **COMPLAINT**
RENAISSANCE RX,              :
SYNTACTX, LLC,              :    **IN CAMERA AND UNDER SEAL**
                                :
              Defendants.   :    JURY TRIAL DEMANDED
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

On behalf of the United States of America and himself, Relator Philip Bergeron ("Relator")
files this False Claims Act *qui tam* complaint against Defendants UTC Laboratories, LLC, doing
business as Renaissance RX, and Syntactx, LLC and alleges as follows:

<u>INTRODUCTION</u>

1.      This is a civil action to recover damages and penalties on behalf of the United
States of America arising from false claims and statements made and presented by the Defendants
and/or their agents and employees in violation of the Federal False Claims Act ("FCA"), 31 U.S.C.
§ 3729 *et seq*. Under the FCA, a private person known as a relator, or whistleblower, may file an
action on behalf of the United States of America pursuant to the *qui tam* provisions of the FCA. 31

U.S.C. § 3730(b). The violations alleged herein involve the payment of kickbacks and submission of false claims for genetic laboratory testing services to the Medicare Program. It is estimated that this fraud has cost the Medicare Program millions of dollars.

2.     Liability attaches under the FCA when a defendant submits or causes another to submit a claim for payment from government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used to get a false or fraudulent claim for government funds paid or approved.

3.     Liability also attaches under the FCA when a defendant knowingly conceals, improperly avoids or decreases an obligation to pay or transmit money or property to the government.

4.     The FCA permits any person having information regarding an FCA violation to file an action on behalf of the government to recover damages and receive a portion of any recovery as an award to the qui tam plaintiff. 31 U.S.C. § 3730(d). It is a requirement under the Federal False Claims Act that the Complaint be filed under seal (without service on the defendants) to enable the government to conduct its own investigation without the defendants' knowledge and to allow the government an opportunity to intervene in the action.

5.     Based on these provisions, Relator seeks to recover damages and statutory penalties arising from the Defendants' presentation of false and fraudulent records, claims, statements, certifications, and reverse false claims made to the United States of America in connection with Defendants' provision of Medicare-funded diagnostic laboratory services.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 and 1345. The Court has supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

7.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a). Jurisdiction is proper over Defendants because they can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and some of the alleged violations under 31 U.S.C. § 3729 occurred within this district.

8.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because the Defendants can be found and transact business within this district and alleged violations occurred in this District.

9.      Relator brings this action on behalf of himself and the Government pursuant to 31 U.S.C. § 3730(b)(1).

## DEFENDANTS

10.      Defendant **UTC Laboratories, LLC**, doing business as **Renaissance RX** ("Renaissance"), is a Louisiana limited liability company with its main office located at 1441 Canal Street, Ste. 401, New Orleans, LA 70112.

11.      Defendant **Syntactx, LLC** is a New York limited liability company with its principal place of business located at 7 World Trade Center, 250 Greenwich Street, 46th Floor, New York, New York 10007.

12.      The Centers for Medicare and Medicaid Services (CMS) regulates all laboratory testing (except research) performed on humans in the U.S. through the Clinical Laboratory Improvement Amendments Act of 1988, 102 Stat. 2903, Public Law 100-578. Renaissance, under

3

the UTC Laboratories name, is certified as a complex clinical medical laboratory with CLIA number 19D2044330.

13.    Renaissance, under the UTC Laboratories name, bills the federal health care programs, including Medicare, under National Provider Identification number 1720342884.

14.    Renaissance is an independent laboratory as defined in Title XXVIII of the Social Security Act, 42 U.S.C. § 1395, et seq.

15.    Conduct that is alleged to have committed by "Defendants" means acts committed by, or on behalf of, Defendants' employees, agents, officers, representatives, or designees. Defendants have directed or knowingly, recklessly, or with deliberate indifference encouraged or failed to prevent the actions alleged herein.

## THE RELATOR

16.    The Relator, **Philip Bergeron**, is an owner of a Rhode Island company that assists physicians with participating in and administering clinical trials.

17.    Relator's company regularly participates in registered, privately-funded clinical research. He has extensive experience in conducting and administering clinical trials.

18.    As defined by 31 U.S.C. § 3730(e)(4)(B), Relator is an "original source" of the allegations made herein. Specifically, the violations alleged herein are based upon Relator's personal knowledge, his expertise, and non-public documents made available to Relator during his interaction with Defendants. Relator has provided the information that forms the basis of the allegations made herein to the federal government prior to filing this Complaint.

REGULATORY FRAMEWORK

19.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (or "Medicare").

20.     Generally, Medicare coverage is available for services that are considered to be reasonable and necessary under §1862(a)(1)(A) of the Social Security Act. Medicare does not cover services that are considered investigational or have no proven clinical benefit.

21.     The Medicare program is overseen by CMS, which is an agency within the U.S. Department of Health and Human Services.

22.     CMS issues coverage determinations that specify whether certain services are a covered Medicare benefit.

23.     In addition, CMS has contracted with Medicare Administrative Contractors (MACs) that conduct the claims review and reimbursement determination process, as well as publish Medicare coverage guidance through the issuance of Local Coverage Determinations (LCDs).

24.     In July 2007, CMS issued a National Coverage Determination (NCD) addressing the circumstances under which Medicare would cover routine costs in clinical trials (the "Clinical Trial NCD"). Medicare National Coverage Determinations (NCD) Manual, Section 310.1, http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/ncd103c1_Part4.pdf (last visited March 26, 2014).

25.     Pursuant to the Clinical Trial NCD, Medicare will cover the routine costs of a qualifying clinical trial—e.g., all items and services that are otherwise generally available to

5

Medicare beneficiaries—but does not pay for the investigational item or service itself unless otherwise covered outside of the clinical trial.

26.     CMS may also determine that the cost of an investigation item or service in a clinical trial will be covered under §1862(a)(1)(E) of the Social Security Act (Coverage with Evidence Development), in which case CMS will issue a NCD identifying the items to be covered. *See* National Coverage Determination (NCD) for Pharmacogenomic Testing for Warfarin Response, Section 90.1, *available at* http://www.cms.gov/Regulations-and-Guidance/ Guidance/Manuals/Downloads/ncd103c1_Part2.pdf (last visited March 20, 2014).

27.     Only two clinical trials—one sponsored by Washington University and the other by Iverson Genetics—have been approved for Medicare coverage under the Coverage with Evidence Determination for Pharmacogenetic Testing for Warfarin Response. *See* CMS, Coverage with Evidence Development, Pharmacogenomic Testing to Predict Warfarin Responsiveness, *available at* http://www.cms.gov/Medicare/Coverage/Coverage-with-Evidence-Development/Pharmaco genomic-Testing-to-Predict-Warfarin-Responsiveness.html (last visited March 25, 2014).

28.     Healthcare providers that submit claims to Medicare in connection with a qualifying clinical trial must still comply with 42 U.S. Code § 1320a–7b (the "Anti-Kickback Statute").

29.     Healthcare providers that submit claims to Medicare in connection with a qualifying clinical trial must still comply with Section 1877 of the Social Security Act, 42 U.S.C. § 1395nn, et seq. and 42 C.F.R. §411.350, et seq. (the "Stark Law")

30.     After a physician prescribes a clinical laboratory test for a Medicare-eligible patient, the laboratory to whom the test is referred will generally submit a claim directly to

6

Medicare for reimbursement under the laboratory's National Provider Identification (NPI) number.

31.     Laboratory tests are reimbursed based upon a clinical laboratory fee schedule that is issued by CMS. Each type of laboratory service is associated with a Healthcare Common Procedure Coding System (HCPCS) code—a standard procedure coding system issued and maintained by CMS. To receive reimbursement from Medicare, a laboratory submits a claim to the MAC for its jurisdiction that contains one or more HCPCS codes indicating the covered testing services performed by the lab. Payment for approved claims is made directly to the laboratory by Medicare based upon the sum of the pay rates for the HCPCS codes that were claimed.

32.     In addition to the HCPCS codes, each Medicare claim must also contain a code indicating the diagnoses that justify the tests performed. This diagnosis coding system is referred to as the International Statistical Classification of Diseases and Related Health Problems (referred to as "ICD" codes).

33.     The clinical laboratory services referenced in this complaint are laboratory-developed, molecular diagnostic tests that determine whether an individual has certain genetic variations that affect the cytochrome P450 (CYP450) system. This type of genetic test is referred to as pharmacogenetic testing and is meant to identify genetic variations that effect how an individual patient metabolizes certain drugs.

34.     Pursuant to the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in exchange for the referral of any service (including laboratory testing) for which payment is sought from any federally funded health care program, including Medicare, Medicaid, and TRICARE.

35.     The Anti-Kickback Statute prohibits providers, such as clinical laboratories, from compensating a health care provider when one purpose of the payment is to influence the provider's prescribing habits or to gain favor for its product over the product of any competitor.

36.     A violation of the Anti-Kickback Statute is a violation of the federal False Claims Act (the "FCA").

37.     The Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors protects Defendants from liability for the conduct alleged herein.

38.     The Stark Law, 42 U.S.C. §1395nn, et seq., prohibits a provider, such as a clinical laboratory, from paying remuneration to physicians for referring Medicaid patients to the provider for certain "designated health services" (DHS), including laboratory services, where the referring physician has a nonexempt "financial relationship" with the DHS provider. 42 U.S.C. § 1395nn(a)(1), (h)(6). The Stark Law provides that the DHS provider shall not cause to be presented a Medicare or Medicaid claim for such items or services. The Stark Law also prohibits payment of claims for services rendered in violation of its provisions. 42 U.S.C. § 1395nn(a)(I), (g).

39.     Clinical laboratory services are designated health services as defined in Section 1877(h)(6) of the Social Security Act and 42 C.F.R. § 411.351.

40.     A claim submitted to Medicare in violation of the Stark Law is a violation of the False Claims Act by both the referring physician and provider of the designated health service.

ALLEGED MISCONDUCT

41.     Defendants are the sponsors of a clinical trial titled "Diagnosing Adverse Drug Reactions Registry (DART)" (the "DART Trial").

42.     The DART Trial has been registered on the National Institutes of Health's online registry, www.clinicaltrials.gov, under clinical trial identifier NCT01970709.

43.     The DART Trial purports to develop a registry of at least 250,000 patients that have had pharmacogenetic testing and record the effect the testing has on the patients' drug regimens and clinical outcomes.

44.     Defendants are using the DART Trial to knowingly and intentionally perpetuate a scheme to induce physicians to prescribe unnecessary and uncovered genetic testing, which is provided to the DART Trial patients and billed to the Medicare program by Renaissance.

45.     Defendants designed and promoted the DART Trial to induce physicians to make referrals for unnecessary and improper Medicare-reimbursed clinical laboratory services to Renaissance by providing improper compensation to the physicians and falsely representing that Medicare will cover for the pharmacogenetic testing that is a prerequisite for enrollment in the DART Trail.

46.     According to the documentation submitted to the National Institute of Health and other federal agencies that oversee clinical trials, the DART Trial began in October 2013 and is scheduled to run through November 2015.

47.     Beginning in mid-2013, Defendants have hired numerous marketing representatives to recruit physicians across the nation to participate in the trial as investigators (the "Participating Physicians").

48.     Defendants pay their marketing representatives approximately 30% commission based upon the Medicare reimbursement Renaissance receives for the patients that are enrolled by Participating Physicians recruited by that representative.

49.     No later than September 2013, Defendants began knowingly submitting claims for pharmacogenetic testing for thousands of patients referred to Renaissance for testing by the Participating Physicians.

50.     Defendants have continued to submit claims to Medicare for pharmacogenetic testing for prospective DART Trial patients referred by the Participating Physicians to Renaissance through the present date.

51.     Defendants provide the Participating Physicians with a written contact that states that Renaissance will pay the Participating Physician $75 for every patient that is enrolled in the DART Trial.

52.     Defendants have knowingly made prescription of the pharmacogenetic testing services provided solely by Renaissance a prerequisite to a patient's enrollment in the DART Trial.

53.     After a Participating Physician refers a patient to Renaissance for testing and receives the test results, his or her obligations under the DART Trial are simply to report to renaissance whether the patient's drug regime was altered based on the results and report any adverse drug reactions in the DART Trial patients. This obligation is minimal and the scientific value of this data is negligible because most adverse drug reactions occur when a patient begins taking a medication, there are many alternate indications for adjusting a drug dosage, and most Medicare patients have been taking their medications for a long period of time prior to receiving Renaissance's pharmacogenetic testing.

10

54.     Defendants, through the use of marketing representatives trained or compensated in a manner to promote this behavior, inaccurately inform the Participating Physicians that Medicare will pay for the entire cost of the pharmacogenetic testing performed by Renaissance.

55.     Defendants instruct the Participating Physicians that Defendants only want Medicare-eligible patients enrolled in the DART Trial and that Defendants will only pay the Participating Physicians the $75 per-patient fee if the testing is prescribed for a Medicare patient.

56.     Defendants further provide the Participating Physicians with an employee to assist in the collection of patient specimens (buccal swabs) for testing and to input patient data and submit the pharmacogenetic testing order to Renaissance. This employee is paid and trained by Defendants, but Defendants inform the Participating Physicians that they can identify a person they would like to be the employee if they choose.

57.     Defendants condition the provision of the employee referenced in the preceding paragraph on the Participating Physicians' enrollment (and prescription of pharmacogenetic testing from Renaissance) of at least 8-10 Medicare patients per day.

58.     Defendants knowingly and intentionally provide the employee to the Participating Physicians to encourage and induce them to refer Medicare patients to Renaissance.

59.     Defendants recruit Participating Physicians by falsely telling them that the DART trial:

    a.      has been approved by CMS and Medicare.

    b.      that participating in the DART Trial can provide an excellent source of revenue for the physicians' practice.

    c.      that CMS or Medicare has agreed to cover one-hundred percent of the cost of the pharmacogenetic testing ordered by the Participating Physicians.

    d.  that the DART Trial is sponsored or approved by well-known research universities, such as Duke University and Vanderbilt University.

  60.  Defendants, to knowingly induce Medicare referrals, inform the Participating Physicians that patients with private insurance can participate in the DART Trial but that their insurance may not cover the cost of the pharmacogenetic testing and that Defendants will not pay the $75 per-patient fee to the Participating Physicians for patients' whose insurance does not cover the testing.

  61.  Defendants, to knowingly induce Medicare referrals, also represent to the Participating Physicians that Renaissance will never attempt to collect any unpaid co-pays or non-covered testing costs the enrolled patients may owe to Renaissance.

  62.  The protocol for enrollment in the DART Trial is generally that: (1) the patient is over the age of 18, (2) the patient is taking three or more medications, two of which are metabolized by the CYP450 pathway, and (3) the treating physician has a clinical suspicion that the subject is experiencing adverse signs or symptoms related to a prescribed medication or is not achieving the intended effect from the medication.

  63.  Defendants incorrectly inform the Participating Physicians that the protocol for enrollment in the DART Trial also indicates a patient for which the prescription of pharmacogenetic testing is appropriate, medically necessary, and covered by Medicare.

  64.  Defendants intentionally de-emphasize, or instruct the Participating Physicians that they can ignore, the requirement that a patient is suffering from an adverse drug reaction as a prerequisite for prescription of pharmacogenetic testing and enrollment in the DART Trial.

  65.  Another enrollment requirement of the DART Trial is that the patient must not have received other pharmacogenetic testing in the past 12 months. Defendants included this limitation

knowing that it would cause or allow for the over-prescription of pharmacogenetic testing with no clinical value because the results of genetic testing do not change. Once a patient has received a genetic test, there is no clinical benefit from an additional, identical test.

66.     Defendants provide the Participating Physicians with a username and password to a web-based billing system designed and operated by Defendants that submits orders for pharmacogenetic testing directly to Renaissance.

67.     Defendants provide at least some Participating Physicians with a laptop on which to access Renaissance's web-based billing system.

68.     Defendants train the employee they provide to the Participating Physicians to input numerous HCPCS codes, which indicate the different pharmacogenetic tests being ordered for a patient, as well as the ICD codes indicating the Participating Physician's diagnosis for which the testing is indicated.

69.     The HCPCS codes used by Defendants for improper genetic testing services include: (1) 81225, which indicates CYP2C19 gene analysis and is reimbursed at $291.80 per test; (2) 81226, which indicates CYP2D6 gene analysis and is reimbursed at $451.59 per test; (3) 81227, which indicates CYP2C19 gene analysis and is reimbursed at $175.08 per test; and (4) 81401, which indicates genetic analysis of numerous different genes, including CYP3A4/3A5, and is reimbursed at approximately $45 per test.[1] HCPCS codes 81291 and 81355 may also be used to for analysis of the VKORC1 or MTHFR genes, respectively.

70.     The ICD codes Defendants intentionally instruct or cause the Participating Physicians to use include ICD code 995.20, which indicates a diagnosis of unspecified adverse

---

[1] HCPCS reimbursement rates are based upon the 2014 Clinical Laboratory Fee Schedule published by CMS, or from MAC reimbursement guidance where CMS has not issued a published reimbursement rate.

effect of unspecified drug, medicinal and biological substance and ICD code v70.7, which indicates the tests are being ordered for an examination of participant in clinical trial.

71.     The use of ICD code 995.20 is not medically appropriate in the vast majority of cases because the patients are not actually experiencing any adverse effects linked to their drug regimen. This is especially true since most of the DART Trial patients that are being prescribed Renaissance's testing have been taking their current medications past the point when most adverse reactions are likely to occur.

72.     The use of ICD code v70.7 is not appropriate because the patients are not enrolled in a clinical trial when the testing is ordered, nor can ICD code v70.7 be used to justify Medicare reimbursement of the procedure or item that is being investigated. Further, none of the prospective or enrolled DART Trial patients are part of a control group.

73.     The Participating Physicians are not required to review or know the HCPCS and ICD codes being submitted to Renaissance through Defendants' software, which Renaissance uses on the claims it submits to Medicare.

74.     The Participating Physicians often do not even know what tests they are prescribing, nor the diagnoses being used by Renaissance to justify the claims it submits to Medicare for reimbursement because this information is pre-populated by Defendants' software, entered by an employee trained by Defendants, and/or submitted to Renaissance without physician review.

75.     Defendants have knowingly and intentionally designed or programed their web-based test ordering software to pre-populate the HCPCS codes for the tests that a Participating Physician prescribes. This has, as Defendants intended, resulted in the over-prescription of pharmacogenetic testing that has no clinical value because the pre-populated

14

HCPCS codes include gene analyses which do not affect any drug that some patients are currently prescribed.

76. For example, Defendants provide patients with genetic testing services for 5 different gene analyses (CYP2C19, CYP2D6, CYP2C19, CYP3A4, and CYP3A5), even though the patient is taking medications that would only be affected by variations in one of these five genes. There is no clinical or therapy-directly benefit from the other four gene analyses, even assuming that any of the tests could be Medicare-covered, which they are not.

77. Defendants have indicated to Relator that Renaissance receives approximately $800 from Medicare for each patient that is prescribed pharmacogenetic testing as a prerequisite for enrollment in the DART Trial.

78. Defendants have made payments to the Participating Physicians at a rate of $75 per patient for the majority of the enrolled-patient claims described in the preceding paragraph.

79. The compensation paid by Defendants to the Participating Physicians exceeds fair-market value for the services performed by the Participating Physicians because the enrollment of patients in the DART Trail requires minimal administrative work that is largely automated or performed by the employees Defendants provide to the Participating Physicians and software designed and provided by Defendants.

80. Defendants knowingly compensate the Participating Physicians in excess of fair-market value for enrolling patients in the DART Trial and referring laboratory services to Renaissance.

81. Defendants knowingly encourage or instruct the Participating Physicians to enroll thousands of patients in the DART Trial, resulting in aggregate compensation that far exceeds fair

15

market value and the cost of the simple, repetitive, and largely-automated DART Trail patient reports.

82.     Defendants knowingly compensate the Participating Physicians based upon the volume of the laboratory services that the Participating Physicians refer to or order from Renaissance because Defendants pay the Participating Physicians $75 per patient enrolled in the DART Trial and prescription of pharmacogenetic testing services from Renaissance is a pre-requisite to enrollment in the DART Trial.

83.     The compensation paid by Defendants to the Participating Physicians is based upon the volume of the laboratory services that the Participating Physicians refer to or order from Renaissance because Defendants condition the provision of a free employee to the Participating Physicians on the Participating Physicians' enrollment of a daily or weekly quota of DART Trial patients.

84.     Defendants expressly condition payment of the $75 per-patient clinical trial fee on the Participating Physicians' referral of the patient to Renaissance, as opposed to any other lab, for pharmacogenetic laboratory testing services.

85.     Defendants knowingly and intentionally provide remuneration to the Participating Physicians in order to induce referrals for laboratory services that are billed to the Medicare program.

86.     Defendants knowingly, recklessly, or with deliberate indifference agreed to carry out the scheme alleged herein with the purpose of obtaining payments from a federal program in violation of the False Claims Act.

87.     Even assuming that some portion of the pharmacogenetic testing prescribed to the DART Trial patients was Medicare covered outside of the clinical trial context, Medicare

16

regulations require that the clinical trial be registered on the clinicaltrials.gov website and the clinical trial identification associated with this registration be included on every Medicare claim that is associated or related to the clinical trial.

88.     Defendants knowingly falsely stated, or materially omitted, the patient enrollment requirements for DART Trial on their the application and other documentation submitted to the National Institute of Health (and other governmental agencies that reviewed the DART Trial), to ensure registration on the clinicaltrial.gov website, because Defendants did not indicate in the DART Trial protocol that the patient registry would be limited to Medicare patients, the majority of which are over 65.

89.     The omission or misstatement of this criteria is material to the government's approval or registration of the DART Trial because this criteria limits the trial to patients that are less likely to benefit from pharmacogenetic testing due to the shorter length of time that the pharmacogenetic information will be useful and longer length of time that the patient group has been already been receiving their current drug regime.

90.     Defendants, on or around October 22, 2013, submitted documentation to the National Institute of Health to register the DART Trial on the clinicaltrials.gov website that falsely or misleadingly described the age group for the DART Trial as all patients over 18 years of age. This same documentation intentionally omitted Defendants' requirement that patients be Medicare-eligible to enroll in the DART Trial.

91.     The Clinical Trial NCD states, as a prerequisite to Medicare coverage for routine costs in medical trials, that:

> Clinical trials that meet the qualifying criteria will receive Medicare coverage of routine costs after the trial's lead principal investigator certifies that the trial meets

17

the criteria. This process will require the principal investigator to enroll the trial in a Medicare clinical trials registry, currently under development.

Some clinical trials are automatically qualified to receive Medicare coverage of their routine costs because they have been deemed by AHRQ, in consultation with the other agencies represented on the multi-agency panel to be highly likely to have the above-listed seven desirable characteristics of clinical trials. The principal investigators of these automatically qualified trials do not need to certify that the trials meet the qualifying criteria, but must enroll the trials in the Medicare clinical trials registry for administrative purposes, once the registry is established.

92.     The Medicare registry described in the preceding paragraph has been established.

93.      Even assuming that some portion of the pharmacogenetic testing prescribed to the DART Trial patients was Medicare covered outside of the clinical trial context, Defendants knowingly failed to register the DART Trial on this registry. As a result, the DART Trial did not meet the prerequisites for Medicare payment of costs associated with a clinical trial.

94.     Syntactx has knowingly provided employees and consultation services to Renaissance that have caused or assisted Renaissance and the Participating Physicians in submitting false claims to the Medicare program.

95.     Syntactx employees have and continue to directly recruit and maintain contact with Participating Physicians and potential Participating Physicians.

96.     Email communications sent to the Participating Physicians regarding the DART Clinical Trial are jointly signed by Syntactx and Renaissance. On information and belief, at least some of these emails are composed and sent by Syntactx employees.

97.     Syntactx has known since the inception of the DART Trial that the Medicare claims submitted by Renaissance for pharmacogenetic testing services:

a.      are fraudulent;

b.      contain false statements;

c.    constitute prohibited referrals under the Stark Law and Anti-Kickback Statute;

d.    were induced by the payment or promise of improper compensation in violation of the Stark Law and Anti-Kickback Statutes;

e.    are for services that are not covered by Medicare; and

f.    would not be paid by Medicare without the commission of the violations described herein.

98.    Despite this knowledge, Syntactx agreed to assist Renaissance Rx in perpetuating a fraudulent scheme to obtain improper and illegal payments from the Medicare Program.

99.    Syntactx has knowingly received payment from Renaissance Rx from, or in anticipation of, the improper payments Renaissance receives from Medicare.

100.    Defendants have knowingly caused the Participating Physicians to make or use false records or statements that are material to the false and fraudulent Medicare claims submitted by Renaissance by causing the Participating Physicians to (1) order clinical laboratory testing that are not covered by Medicare and (2) prescribe laboratory testing using HCPCS and ICD codes that do not accurately reflect a patient's diagnosis or clinical needs.

101.    As a result of the compensation provided by Defendants to the Participating Physicians, the Participating Physicians were and are prohibited from making referrals for clinical laboratory services to Renaissance that are paid by Medicare or the state Medicaid programs.

102.    As a result of the compensation provided by Defendants to the Participating Physicians, Renaissance was and is prohibited from seeking reimbursement from Medicare or the state Medicaid programs for services referred to Renaissance by the Participating Physicians.

103.    Defendants have knowingly caused the Participating Physicians to make or use false records or statements that are material to the false and fraudulent Medicare claims submitted

19

by Renaissance because the express or implied certifications that the services prescribed by the Participating Physicians are medically necessary or Medicare-covered are false.

104.    Defendants have knowingly caused the Participating Physicians to make or use false records or statements that are material to the false and fraudulent Medicare claims submitted by Renaissance by falsely stating to the Participating Physicians that the pharmacogenetic testing services that will be prescribed for DART Trial patients is clinically-appropriate, covered by Medicare, subject to special coverage provisions due to the services' connection with a registered clinical trial.

105.    Renaissance received prohibited referrals for laboratory services from Participating Physicians and knowingly submitted prohibited Medicare claims for pharmacogenetic testing services for DART Trail-enrolled patients to MAC for Renaissance's jurisdiction, which is believed to be Novitas Solutions, Inc. ("Novitas"), by submitting CMS Form-1500 or an electronic equivalent.

106.    Novitas, or other MAC, approved these improper Medicare claims submitted by Renaissance based upon the false and fraudulent acts by Defendants alleged herein.

107.    An MAC is required to approve or deny claims within 30-days of receipt, and may be required to pay interest on claims that should have been approved within this time limit but were not. The MAC presents the Medicare claim to the federal government. The federal government makes direct payments to the provider (Renaissance) for claims that are approved and presented by an MAC (Novitas).

108.    Medicare made payments to Renaissance for the improper pharmacogenetic testing claims Renaissance submitted to Novitas (or other MAC).

109.    Every single claim submitted to Medicare by Renaissance for pharmacogenetic laboratory testing services for patients that are or will be enrolled in the DART Trial is a false claim under the False Claims Act, as well as a violation of the Stark Law and Anti-Kickback Statute.

110.    A partial list of Participating Physicians is attached hereto as **Exhibit A**. Every referral from September 2013 to the present by the Participating Physicians to Renaissance for medical services reimbursed by a federal program was prohibited by the Stark Law and Anti-Kickback Statute. Every claim submitted to a federal program by Renaissance for these referred services is a violation of the False Claims Act.

111.    A representative list of the individual false claims by Defendants is attached hereto as **Exhibit B**. This list identifies the Renaissance Specimen ID number, testing date, Participating Physician, and date of payment by Renaissance to the Participating Physician of the DART Trial per-patient fee ($75). Each Medicare claim by Renaissance for pharmacogenetic testing for these DART Trial patients violates the False Claims Act as described herein.

112.    In addition, Defendants, on or near March 21, 2014, registered another clinical trial on the clinicaltrials.gov website titled "Urine Toxicology With Pharmacogenomic Interpretation Assay: UTOPIA" (the "UTOPIA Trial"). The clinicaltrials.gov identifier for this second clinical trial is NCT02096172.

113.    The UTOPIA Trial purports to establish a 200,000-patient registry to study how pharmacogenetic testing results affects urine analysis results.

114.    Like the DART Trial, Defendants have encouraged the Participating Physicians and other physicians to participate as investigators in the UTOPIA Trial by promoting the revenue-generating potential of the UTOPIA Trial.

115.    Upon information and belief, Defendants are or will be using the UTOPIA Trial to provide illegal remuneration to physicians for referring pharmacogenetic and/or urine analysis testing services to Renaissance that will be submitted to and reimbursed by federal or state healthcare programs in knowing violation of the Stark Laws, Anti-Kickback Statute, and False Claims Act.

COUNT I:   PRESENTATION OF FALSE CLAIMS UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3729 (a)(1))

116.    Relator realleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

117.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1), as amended.

118.    By virtue of the acts described above, Defendants knowingly or acting with deliberate ignorance or with reckless disregard for the truth, presented or caused to be presented to the United States Government false or fraudulent claims for government funding under Medicare (and other federal health programs).

119.    Such claims were false or fraudulent because the Defendants knowingly presented, or caused to be presented, claims for clinical laboratory service to the Medicare program that were not eligible for reimbursement.

120.    The United States, unaware of the falsity of the claims made by the Defendants, paid Defendants for claims that would otherwise not have been allowed.

121.    By knowingly failing to comply with requirements upon which payment was contingent, each claim presented by Defendants was false.

122.     By knowingly, willfully or recklessly presenting, or causing other to present, false claims for payment to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendant has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

123.     As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

124.     Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

125.     Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

COUNT II:   FALSE RECORD OR STATEMENT UNDER THE FALSE CLAIMS
ACT (31 U.S.C. § 3729 (a)(1)(B))

126.     Relator realleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

127.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(B), as amended.

128.     By virtue of the acts described above, Defendant knowingly or acting with deliberate ignorance or with reckless disregard for the truth, made, used, and caused to be made

23

and used, false records and statements that were material and resulted in the improper payment of federal funding to Defendants.

129.    The United States, unaware of the falsity of the records and statements, paid Defendant for claims that would otherwise not have been allowed.

130.    Payment by the United States for all Medicare laboratory-service claims submitted by Defendants was conditioned upon Defendants' explicit and implicit certifications of compliance with the laws and regulations governing the Medicare program.

131.    By knowingly, willfully or recklessly making, or causing others to make, false statements and certifications material to the United States' decision to pay on false claims, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay.   In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

132.    As a direct and proximate result of Defendant's fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly false claims that it would not otherwise have paid.

133.    Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

134.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

COUNT III:    FAILURE TO RETURN OVERPAYMENTS UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(1)(G))

135.    Relator realleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

136.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(G), as amended.

137.    By virtue of the acts described above, Defendants have knowingly concealed and/or knowingly and improperly avoided its obligation to transmit money recovered to the federal government.

138.    Even if the improper payments were not fixed or clearly defined, Defendants had an obligation to remit or report improper payments to the government within sixty (60) days.

139.    Defendants knew or should have known, at least 60 days prior receipt of payment for the earliest false claims identified herein, that the payments they received from Medicare for laboratory testing services were improper and gave rise to an obligation to return those payments to the federal government.

140.    By knowingly concealing and/or knowingly and improperly avoiding its obligation to transmit money recovered to the federal government, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), to the damage of the treasury of the United States of America, by causing the United States to be deprived of funds that rightfully belong to the government.

141.    As a direct and proximate result of Defendants' fraudulent and/or illegal actions and fraudulent conduct, the United States has been deprived of funds to which it is lawfully entitled and which were improperly paid to Defendants.

142.    Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

143.     Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five-thousand five-hundred to eleven-thousand dollars ($5,500 - $11,000).

COUNT IV:   CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT
(31 U.S.C. § 3729 (a)(1)(C))

144.     Relator realleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

145.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(C), as amended.

146.     By virtue of the acts described above, Defendants have knowingly conspired to violate 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

147.     Defendants knowingly, recklessly, or with deliberate indifference agreed to perpetuate a fraudulent scheme to obtain and retain improper Medicare payments in violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G).

148.     The United States, unaware of the falsity of the records and statements, paid Defendant for claims that would otherwise not have been allowed as a result of the actions taken by Defendants in furtherance of conspiracy that violates U.S.C. § 3729 (a)(1)(C).

149.     By knowingly conspiring to conduct a scheme to violate the False Claims Act, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

150.    As a direct and proximate result of Defendant's fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly false claims that it would not otherwise have paid.

151.    Defendants are jointly and severally liable for every violation of the False Claims Act identified herein because these violations were committed in furtherance of a scheme to violate the False Claims Act, which was undertaken with the mutual agreement each Defendant and knowledge of the scheme's illegality.

152.    Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

153.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 - $11,000).

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

a.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, et seq.;

b.      Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

c.      Relator is awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.      Relator is awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

e.      Defendants are enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.   Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

g.   Defendants pay prejudgment interest on all damages and disgorgements to maximum extent provided under federal law.

h.   The United States and Relator recover such other relief as the Court deems just and proper.

JURY DEMAND

154.   A trial by jury is hereby demanded.

Dated:

*April 7, 2014*

                                        LEVY KONIGSBERG LLP

                                        By: _____
                                            Alan J. Konigsberg (AJK6373)
                                            *akongisberg@levylaw.com*
                                            Brendan E. Little (pending)
                                            *blittle@levylaw.com*

                                            800 Third Ave., 11th Floor
                                            New York, NY 10022
                                            Phone:   (212) 605-6200
                                            Fax:   (212) 605-6290

                                            *Attorneys for the Relator*

28